# CHARLESTON.

CROUCH *v.* CROUCH.

Submitted June 10, 1911.   Decided April 2, 1912.

APPEAL AND ERROR—*Review—Decree in Equity.*

> A decree in equity, founded upon weighty inferences arising from well established facts and circumstances, will not be reversed for a mere preponderance against the finding in the number of witnesses, testifying as to a fact in issue.

Appeal from Circuit Court, Brooke County.

Suit by Mary E. Crouch against Joseph A. Crouch. Decree for defendant, and complainant appeals.

*Affirmed.*

*J. B. Sommerville* and *J. F. Cree,* for appellant.

*John J. Coniff* and *George W. McCleary,* for appellee.

POFFENBARGER, JUDGE:

Deeming the plaintiff's charges of cruelty, made against her husband, as ground for a divorce *a mensa et thoro,* unsustained by the evidence, the trial court dismissed her bill and she complains here on appeal.

Her charges, supported by her testimony, are substantially as follows: Some time after their marriage, he began a systematic course of ill treatment, inflicted secretly upon her in the absence of all other persons; compelled her to teach school and do the house work, not allowing her to employ help at her own expense, and so impaired her health; forsook her bed and refused to sleep with her; for some time made her sleep in a cold and rather dilapidated room; refused to provide clothing for her; cursed her when she requested his help in putting up a clothes line and when she offered him money to make a small purchase for her; struck her with his fist, when she endeavored to open a door for him; threatened to shoot her and to knock the top of her head off with a poker; expressed a wish that she had not been able to get out, when she informed him she had fallen into the creek; refused ever to have sexual intercourse with her, though, in her opinion, able to do so, and cognizant of her desire for children; threatened to throw her in the creek and also out of the window with her effects, calling them "rags"; and called her vile names, liar, bitch and whore, on numerous occasions. All this the defendant denied emphatically and the plaintiff is corroborated as to only one transaction, and the corroborating evidence consists of testimony of her brother and a detective, employed for the purpose of procuring evidence sufficient to justify a divorce.

This transaction is said to have occurred the evening before she left her husband's home. According to her statement, she

prepared their supper, rather later than usual, and then requested him to come and eat. Intsead of doing so, he went to bed in an adjoining room and refused. The invitation was repeated several times, he either refusing to answer or responding with threats and personal abuse. Finally he called her a whore and threatened to come out and mash her head in with a poker. She says she then stepped out on a back porch to which the kitchen opened and found there her brother, Hugh Orum, and the detective, J. A. Kraver. These two men say they heard part of the conversation between the husband and wife and admit they went there for the purpose of seeing or hearing something to which they could testify in favor of the latter. Orum says they went there to protect his sister, but also admits they were looking for evidence. Neither of them entered the house. Though on the outside and near each other all the time, their testimony varies to some extent. As the character and extent of these discrepancies are not of themselves controlling nor vitally important, it would be a waste of time, labor and space to set them forth in detail. It suffices to say Orum does not testify to having seen or heard all that Kraver says he saw and heard, and accounts for the variance by saying he was at times some distance from Kraver.

As circumstances bearing upon the question of veracity, we note the following: Mrs. Crouch was about 40 years old, and her husband about 62 years old, when they were married. He was the owner of. a farm worth about $20,000.00, some tangible personal property and money. His wife had been a school teacher, for several years before her marriage, and, at the time, owned some real estate and had saved some money. She had inherited a one-fifth interest in a farm which, with its improvements, is assessed for taxation at more than $18,000.00, and has purchased another one-fifth interest in the same farm. Besides, she owns two lots in Wellsburg and a small tract of land, containing about three acres. She was teaching a country school in the neighborhood at the date of her marriage, in November, 1905, and finished the term after her marriage. The next year, she taught a different neighboring school, and the second year after marriage again taught the school she was teaching when married. This ended in the spring of 1908. She left her hus-

band October 29, 1908. By her own admissions, this teaching was voluntary. She says she taught only because she knew her husband desired her to do so and procured the employment for her. She testifies to no protest on her part nor coercion on the part of her husband. She found fault with his liberality toward a boy or young man whom he had, it seems, partially raised, and for whom he had a sort of fondness, if not affection. She expressed to neighbors anxiety and fear as to the disposition of her husband's estate, and, he says, requested him to convey his farm to her and then leave, asserting her ability to manage it. Two of these neighbors, presumptively credible persons, since no attempt was made to impeach them, say she endeavored to engage their services in an effort to obtain a divorce as a measure of protection against loss of her prospective interest in her husband's estate, offering them or one of them $25.00 and suggesting procurement of the testimony of the boy, Ellison, in her favor. Later she employed a detective agency through which testimony in support of her bill for divorce and alimony was procured. Several neighbors testify to the husband's kindliness of disposition, and his uniform kindness and assistance to his wife, when they were about the home. He milked, made fires, brought vegetables from the garden for meals, assisted in the kitchen and actually cooked, sometimes preparing her breakfast, during the school term, before she got up. In bad weather, he took her part of the way to the school house on a horse and met her with a horse on her return. They were often seen together, driving along the road and visited neighbors together. He denies the use of profanity since his boyhood and persons who have known him well for years, corroborate the statement to the extent of their knowledge, saying he was exceptional in that respect. Some of these witnesses say she admitted kind treatment by her husband until sometime in the last year of her residence with him, and then suddenly declared she had never liked him and never could. In addition to her own testimony as to the grounds of her complaint, she adduced that of her brother and detective Kraver and no more. Kraver was a paid agent and the brother a very close relative. Many of the defendant's witnesses were both disinterested and unrelated.

That this plain, unsophisticated old farmer could have suc-

cessfully played the double role, charged by his wife and her witnesses, is almost inconceivable. The record of his life, his fixed habits, his age, his mental slothfulness, are all inconsistent with the theory of the bill and the plaintiff's testimony. No motive for such imputed misconduct on his part is shown, other than mere personal dislike, which he denies and his outward conduct contradicts. Some of the circumstances related in the testimony for the defense, and partially admitted by the plaintiff, if true, are indicative of design on her part upon his property, in both the marriage and the suit for divorce. Her alleged effort to procure the fabrication of evidence for divorce by neighbors may have been consummated through the detective agency, and the evidence so procured tends to sustain but a single isolated incident, shown by disinterested witnesses to be wholly inconsistent with the man's nature and temparament, as well as all of his outward conduct.

In this state of the evidence, we perceive no circumstances of such weighty significance or controlling influence as to enable us to say the trial court erred in its finding. On the vital question, the witnesses numerically preponderate against the finding, but we cannot say this preponderance should prevail over conflicting inferences arising from numerous inconsistent facts.

Perceiving no error in the decree, we affirm it.

*Affirmed.*